**Bonny G. Rafel, LLC**
570 W. Mt. Pleasant Avenue
Suite #106
Livingston, NJ 07039
Phone: (973) 716-0888
BONNY G. RAFEL, ESQ.  (6929)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| PINO DISTEFANO, | : | Civil Action No.: |
| | : | Hon. |
| Plaintiff, | : | |
| vs. | : | |
| | : | **COMPLAINT** |
| MCI HEALTH AND WELFARE PLAN, | : | |
| VERIZON BUSINESS HEALTH & | : | |
| WELFARE PLAN COMMITTEE f/n/a MCI | : | |
| WELFARE PLANS COMMITTEE, and | : | |
| METROPOLITAN LIFE INSURANCE | : | |
| COMPANY, | : | |
| | : | |
| Defendants. | : | |

Plaintiff, Mr. Pino DiStefano, residing at 65 Massachusetts Street South, Staten Island, New York, by way of Complaint against the Defendants, alleges as follows:

### INTRODUCTION

1.      This is a claim seeking an award of disability income benefits to Mr. Pino DiStefano ("DISTEFANO") pursuant to the MCI HEALTH AND WELFARE PLAN ("the PLAN") providing group Long Term Disability ("LTD") benefits to employees of MCI, Inc. ("MCI") and its subsidiaries and affiliates.

2.      The PLAN pertaining to the provision of LTD benefits was self-funded.  The funds were held in a trust.  The named Plan Sponsor and Plan Administrator of the PLAN was MCI.[1]

---

[1] See Summary Plan Description [DiStefano Plan Documents 228], Exhibit A.

3.      MCI delegated authority and responsibility for PLAN administration to the MCI WELFARE PLANS COMMITTEE. ("MCI COMMITTEE").[2]

4.      Claims for long term disability benefits under the PLAN were administered by third party claims administrators retained by the Plan Administrator.

5.      In 2004, the Prudential Insurance Company of America ("Prudential") was the claims administrator of the PLAN.

6.      In January 2007, METROPOLITAN LIFE INSURANCE COMPANY ("METLIFE") was the claims administrator of the PLAN.

7.      The current Plan Administrator is the VERIZON BUSINESS HEALTH & WELFARE PLAN COMMITTEE ("VERIZON COMMITTEE").[3]

8.      DISTEFANO is a participant in an "employee welfare benefit plan," as defined by the Employment Retirement Income Security Act of 1974, as amended, 29 U.S.C. ERISA § 1001 et seq. ("ERISA"), because he was an employee of a subsidiary of MCI at the time of his disability.

9.      DISTEFANO brings this action against the Defendants for denying his disability insurance benefits in direct contravention of the PLAN.

10.     It is hereby alleged that METLIFE and the MCI COMMITTEE (n/k/a the VERIZON COMMITTEE) were and are fully aware of DISTEFANO's longstanding medical condition which entitled him to disability benefits but in breach of the PLAN denied his disability benefits claim.

11.     This complaint challenges: (1) Defendants unlawfully and unreasonably denied DISTEFANO's LTD benefits without appropriate justification and without granting him a full and fair review of his claim for benefits; (2) Defendants improperly rejected and ignored the opinions of DISTEFANO's treating and examining physicians in an attempt to deprive him of LTD benefits

---

[2] See Exhibit A.
[3] See letter of Hewitt Associates, LLC, Exhibit B.

due; (3) Defendants improperly introduced extra-contractual requirements beyond the criteria set forth in the PLAN; and (4) Defendants failed to provide a reasonable claims procedure that would yield a decision on the merits of DISTEFANO's claim; (5) Defendants improperly conducted a biased review of the claim which led to the denial of benefits due; (6) Each plan administrator, including without limitation Defendant the MCI COMMITTEE and/or the VERIZON COMMITTEE or its designees failed to provide PLAN documents within 30 days of DISTEFANO's request, in violation of ERISA, 29 C.F.R. § 2560.503-1(g), 29 U.S.C. § 1024, and § 1029, subjecting them to penalties under 29 U.S.C. § 1132(c).

12.     By this action, DISTEFANO seeks to (i) recover his past benefits plus interest through the provisions of ERISA, 29 U.S.C. § 1001 et. seq.; (ii) obtain reinstatement of disability benefits under the PLAN; (iii) obtain penalties against each plan administrator, including without limitation the MCI COMMITTEE and the VERIZON COMMITTEE or its designees, under ERISA, 29 U.S.C. § 1132(c); (iv) obtain attorneys' fees pursuant to 29 U.S.C. § 1132(g); and (v) obtain injunctive relief as set forth in the prayer for relief.

### **GENERAL ALLEGATIONS**

### **JURISDICTION**

13.     DISTEFANO's claims relate to an "employee welfare benefit plan" as defined by ERISA, 29 U.S.C. § 1001 et seq.  The subject plan covering MCI employees constitutes a "plan" under ERISA.  This Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132 (e), (f).

14.     Venue is proper under 29 U.S.C. § 1132 (e) (2) and 28 U.S.C. § 1391 because such action may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found.

15.    DISTEFANO has exhausted all administrative remedies under the PLAN claims procedure.

## PARTIES

16.    At all relevant times DISTEFANO was a citizen of the State of New York and was a vested participant in the PLAN, as defined by ERISA 29 U.S.C. § 1002 (2) (7).

17.    At all relevant times, DISTEFANO was employed by a subsidiary of MCI, believed to be known as MCI Network Services Inc.[4]   Upon information and belief, VERIZON COMMUNICATIONS, INC. ("VERIZON"), a Delaware corporation with its principal office in New York, New York, acquired MCI and certain of its subsidiaries including MCI Network Services, Inc. in 2006.  Upon information and belief, MCI Network Services, Inc. is now known as Verizon Business Network Services, Inc.

18.    The PLAN is an "employee welfare benefit plan" as defined by ERISA, 29 U.S.C. § 1002 (1), and may be sued under ERISA as an entity 29 U.S.C. § 1132 (d) (1).

19.    Despite requests beginning in 2006, the Plan Administrator and its designees never provided DISTEFANO with a Summary Plan Description ("SPD") of the PLAN in accordance with the requirements of 29 CFR § 2520.104b-1.  The VERIZON COMMITTEE, through a designee, provided counsel for DISTEFANO a complete copy of the 2004 SPD on February 29, 2008, over 18 months after DISTEFANO's counsel first requested it in writing on August 16, 2006.

20.    The 2004 Summary Plan Description is the SPD applicable to DISTEFANO's claim.[5]

21.    According to the 2004 SPD, MCI was the Plan Sponsor and Plan Administrator of the PLAN.

---

[4] During DISTEFANO's tenure, his employer and its parent corporation underwent a number of different mergers and name changes.
[5] See Exhibit C, [DiStefano Plan Documents 44], the cover sheet for the SPD.

22.     Upon information and belief, VERIZON became the Plan Sponsor in 2006 upon its acquisition of MCI.

23.     According to the 2004 SPD, the Plan Administrator has the exclusive authority to administer and interpret the PLAN and retains the right to make conclusive and binding determinations on questions of eligibility and entitlement to benefits and the right to settle disputes between the PLAN and PLAN participants.

24.     According to the PLAN document, a committee appointed by MCI to administer the plan shall be the Plan Administrator and shall have complete discretion to interpret the provisions of the PLAN, make findings of fact, correct errors and supply omissions.[6]

25.     According to the 2004 SPD, MCI as Plan Sponsor delegated authority and responsibility for PLAN administration to the MCI COMMITTEE.

26.     According to the PLAN document, the committee may delegate responsibilities for the operation and administration of the PLAN, may employ persons to assist in fulfilling responsibilities under the PLAN, may designate fiduciaries other than those named in the PLAN and may allocate fiduciary responsibilities under the PLAN.

27.     According to the PLAN document, the committee and each insurance company that contracts with the company by which it agrees to provide one or more welfare benefits to participants are "named fiduciaries" of the PLAN as defined by Section 402(a)(2), unless the company appoints another person to this position.

28.     According to the 2004 SPD, funding for LTD benefits were derived from the general assets of MCI and contributions made by covered employees and held in trust.

---

[6] See Exhibit D, [DiStefano Plan Documents 12].

29.    According to the 2004 SPD, Prudential provided claims administration services under Program Number 42153 for the PLAN and was delegated responsibility to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits.

30.    Upon information and belief, in 2006 METLIFE contracted with VERIZON to replace Prudential to perform claims administration for the PLAN.

31.    METLIFE did not provide any benefits to participants of the PLAN, but simply provided claims administration services.

32.    Upon information and belief, there is no other PLAN document designating METLIFE as a fiduciary of the PLAN within the meaning of ERISA, 29 U.S.C. § 1002(21)(A).

33.    Employees of METLIFE acted as fiduciaries of the PLAN.

34.    Employees of METLIFE exercised authority and control over the payment of LTD benefits, which are PLAN assets.

35.    METLIFE made the final determination to deny DISTEFANO's claim for LTD benefits under the PLAN and informed MCI of this decision on the same date it informed DISTEFANO.

36.    METLIFE did not consult with the MCI COMMITTEE regarding the decision to deny DISTEFANO's claim nor did the MCI COMMITTEE review or provide input into the decision.

37.    At all relevant times, METLIFE was a fiduciary of the PLAN within the meaning of ERISA, 29 U.S.C. § 1002(21)(A).

## BACKGROUND

38.    DISTEFANO is a 63 year old man who started working for Adesta Transportation, a subsidiary of WorldCom, Inc. in January 2001 as a director of finance.  WorldCom, Inc. was subsequently renamed MCI.  Beginning in August 2003, DISTEFANO worked for a subsidiary of

MCI believed to be known as MCI Network Services, Inc. as a financial analyst with the official title of Senior Staff Specialist.  He was working in this position just prior to the onset of his total disability on or about February 27, 2004.

39.     As a Senior Staff Specialist in finance, DISTEFANO job duties included: conducting financial analysis for new carrier connections, including profitability and cash flow analysis; developing business cases for potential ventures; comparing current termination rates to new deals in view of existing LCR rates; and preparing analysis reports, direct/indirect cost analysis and reports for prospective negotiations.

40.     The Summary Plan Description provides the following definition of disability:

After the Elimination Period, you are disabled when:

- you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and

- you have a 20% or more loss in weekly earnings due to the same sickness or injury[7]

41.     The Prudential Policy, Program #42153 contained in the DISTEFANO administrative claim file provides a definition of total disability that is materially different than the definition of disability contained in the Summary Plan Description because it contains the following additional language:

- After 24 months of payments, you are disabled when it is determined that due to the same sickness of injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience

42.     As a full time employee of MCI, DISTEFANO was a plan participant and entitled to receive disability benefits under the PLAN if he met the policy definition of total disability.

---

[7] See Exhibit E [DiStefano Plan Documents page 243], Summary Plan Description page 198.

43.     The elimination period for the benefits as set forth in the 2004 SPD is the later of 180 days or the expiration of any MCI sponsored short-term disability benefits or short term salary continuation program.  The PLAN provides that MCI will begin to pay benefits which begin to accrue on the first day after the employee completes the Elimination Period and continues while the employee is disabled. According to the 2004 SPD, the Maximum Benefit period for DISTEFANO was to age 66.

44.     The PLAN provides that the amount of Disability Income Benefits is equal to 60% or 70% of the insured's pre-disability income, depending on the option elected.  DISTEFANO elected to receive 60% of his pre-disability income. The PLAN includes an offset provision for Social Security disability income.

45.     DISTEFANO's salary was approximately $97,212.44 per annum at the time of his disability. He therefore qualified for benefits of $5,670.73 per month less any offset for other applicable benefits such as Social Security disability benefits.

46.     DISTEFANO applied and was determined to be eligible for Social Security Disability Benefits in amount of $1,684.00 per month beginning in August 2004.

## DISTEFANO's DISABILITY

47.     DISTEFANO's job as a financial analyst required clarity of thought, an ability to focus, concentrate, communicate well, problem solve, process information quickly, and vast mathematical and analytical skill.  Beginning in 2003, he noticed he was having difficulty remembering information he had researched for presentation topics and was also having problems performing some of the more basic accounting and financial analytics required of his position.  He expressed concerns to his wife that he did not feel as "sharp" as he used to but attributed the problems to the normal process of aging.

48.     When DISTEFANO realized that his cognitive problems were interfering with his ability to perform his position, he became fearful of losing his job and tried to cover up his mistakes by working longer hours.  Meanwhile, DISTEFANO's family noticed that what had started out as forgetfulness at home and difficulties at work became progressively worse.  DISTEFANO was even becoming disoriented on his commute driving home, getting lost on a trip he had made daily for years.  Eventually, DISTEFANO realized that his cognitive functioning had deteriorated to the point where he was no longer able to perform the duties of his occupation and he stopped working on February 27, 2004.

49.     DISTEFANO applied for Short Term Disability ("STD") benefits.

50.     Prudential, the claims administrator for the MCI STD Plan, determined that the proofs submitted by DISTEFANO satisfactorily proved that he qualified for disability benefits under the following definition located in the Prudential policy: "You are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury."

51.     DISTEFANO's primary care physician, Donna Snow, M.D. supported his disability in an Attending Physician Statement dated March 12, 2004, noting his difficulty concentrating was a medical obstacle to his return to work.  Dr. Snow also noted that DISTEFANO's return to work plan was not determined and that he would undergo further testing.

52.     Dr. Snow referred DISTEFANO to Robert Jutkowitz, M.D., a board certified neurologist and co-chief of the neurology section of the department of medicine at St. Vincent's Hospital in Staten Island, New York. On March 22, 2004, Dr. Jutkowitz performed a thorough examination of DISTEFANO, including mental status testing.  Dr. Jutkowitz's initial impression was that DISTEFANO was suffering from an organic mental syndrome and recommended that he undergo an MRI of the head and an EEG.

-9-

53.     DISTEFANO underwent an EEG test on March 27, 2004 which was abnormal and showed some degree of diffuse cerebral dysfunction.  In a subsequent examination on April 26, 2004, Dr. Jutkowitz again administered mental status testing and DISTEFANO had a 1+ positive face-hand test, a neurological test used to detect organic mental disorders.  At that time, Dr. Jutkowitz prescribed Aricept, a medication for Alzheimer's disease, for DISTEFANO.

54.     Dr. Jutkowitz continued to see DISTEFANO on a regular basis over the next year. During this period of time, Dr. Jutkowitz records indicate that DISTEFANO continued to suffer from memory loss, was losing objects at home and demonstrated overall confusion and disorientation.   The abnormal EEG, the positive face-hand test, in conjunction with the DISTEFANO's memory loss and confusion led Dr. Jutkowitz to diagnose him with **early onset Alzheimer's disease** and opine that he was disabled from his occupation as a financial analyst.  Dr. Jutkowitz continued to prescribe DISTEFANO Aricept and added Namenda, another drug used to treat the symptoms of Alzheimer's disease.

55.     The clinical diagnosis of Alzheimer's disease is based on identifying elements within the medical history and clinical exam that are suggestive of the disease together with *exclusion* of other causes of dementia by means of brain imaging and laboratory tests.

56.     In June 2004, DISTEFANO applied for Social Security disability benefits.  His wife, Josephine DiStefano, completed the forms on his behalf and Dr. Jutkowitz submitted a Mental Residual Functional Capacity Assessment form detailing his limitations.

57.     The Social Security Administration referred DISTEFANO for an independent evaluation with neuropyschologist, Stephen Chece, Ph.D.   On July 19, 2004, DISTEFANO underwent a clinical examination and testing by Dr. Chece to assess his cognitive functioning and eligibility for benefits. Dr. Chece supported DISTEFANO's disability, stating that if DISTEFANO was awarded benefits, "he would require assistance in managing funds due to his disability," and in

a subsequent letter to the SSA, noted that DISTEFANO could not travel independently or handle funds of anything above $20 without having to be absolutely trustworthy of the individual who he is dealing with to give him the correct change.  Dr. Chece indicated that these alterations were due to DISTEFANO's organic brain syndrome.

58.     On July 14, 2004, Dr. Jutkowitz completed an Attending Physician's Statement of Disability form for METLIFE, the insurance company who issued two whole life insurance policies to DISTEFANO. He certified that DISTEFANO remains totally disabled due to his medical conditions.  METLIFE accepted DISTEFANO's initial submission of this data as proof of disability and entitlement to a waiver of premium for each policy in 2004.

59.     To date, METLIFE each year continues to conclude that DISTEFANO is totally disabled from performing any occupation and thus entitled to use the Disability Waiver of Premium Benefit Rider contained in life insurance policies 947 111 978 A and 926 501 320 A.

60.     On November 17, 2004, Dr. Jutkowitz also provided an update to the Social Security Administration in which he indicated that DISTEFANO's mental processes had accelerated in their decline and that he could not travel independently without getting lost.  Dr. Jutkowitz also indicated that DISTEFANO was not able to complete serial sevens or remember three out of three words on a sustained basis and had difficulty in making change of more than $20.

61.     On January 5, 2005, the Social Security Administration wrote to Josephine DiStefano to inform her that they had found that DISTEFANO became disabled on February 27, 2004 and that he was entitled to benefits beginning in August 2004.  The Social Security Administration also informed Mrs. DiStefano that they had chosen her to be his representative payee and that, therefore she would receive his checks and use the money for his needs.

62.     DISTEFANO has remained under the regular care of Dr. Jutkowitz and currently takes Aricept and Namenda to treat the symptoms of his Alzheimer's disease.

## CLAIM FOR DISABILITY BENEFITS

63.     By correspondence dated August 4, 2004, Prudential informed DISTEFANO they had determined he was totally disabled from his regular occupation under the PLAN definition and that his LTD claim had been approved effective August 25, 2004.

64.     On August 31, 2004, DISTEFANO underwent an independent medical exam by William B. Head, M.D. at the request of Prudential.

65.     In contrast to the extensive intellectual testing administered by Dr. Chece and the mental status testing administered by Dr. Jutkowitz, the only mental status testing performed by Dr. Head, per his August 31, 2004 report, was asking DISTEFANO to state the date, perform calculations, and recall three objects after five minutes.  According to Dr. Head, DISTEFANO was able to accomplish these tasks but responded slowly.

66.     In his August 31, 2004 report, Dr. Head diagnosed DISTEFANO with impaired sensation and coordination involving the left side of the body and face.  He also diagnosed "[a]pparent mild organic mental syndrome, manifested by slowness of thinking."  Dr. Head qualified his diagnosis stating that "[t]hese findings are subjective and should be interpreted with caution" despite the fact that, according to established research, there is no one specific, objective test which can detect the presence of Alzheimer's disease and the only way to definitively confirm the diagnosis is through an autopsy.

67.     In his August 31, 2004 report, Dr. Head concluded in part:

While he may or may not have Alzheimer's Disease, a brain tumor should be ruled out, but cannot be ruled out without his having a brain MRI scan, with contrast enhancement.

***

Based upon the patient's mental status examination results, it is my opinion that he is mildly neurologically disabled and his disability leave should be continued until he undergoes the brain MRI scan, with contrast enhancement, as recommended above.

68.     On April 1, 2005, Dr. Jutkowitz wrote to Prudential to inform them that DISTEFANO had a repeat MRI with and without gadolinium on November 9, 2004 which was normal.  Dr. Jutkowitz also noted that DISTEFANO had slow progressive difficulty with his memory, primarily recent memory and that he had probable early Alzheimer's disease.[8]

69.     On May 24, 2005 Dr. Head wrote an addendum to his August 31, 2004 report after receiving a copy of DISTEFANO's November 9, 2004 MRI results.  In his addendum, Dr. Head recommended that "[i]n the absence of definitive evidence of Alzheimer's Disease, it is my opinion that DISTEFANO's disability benefits should be ended."  He also stated, "We still need objective evidence to make a diagnosis and give disability."

70.     No laboratory test currently exists that can definitively diagnose Alzheimer's disease except a postmortem autopsy.

71.     On May 24, 2005, Dr. Jutkowitz submitted an Attending Physician Statement to Prudential identifying DISTEFANO's diagnosis as Alzheimer's disease and describing the nature of his impairment as loss of function and memory dysfunction.

72.     By correspondence dated August 10, 2005, Prudential informed DISTEFANO of their decision to terminate his claim for LTD benefits effective September 1, 2005, stating in part: "In the absence of definite evidence of Alzheimer's disease, there does not appear to be any reason why you could not perform any of your job functions, including 'performing detailed computer analysis with keyboarding work.'"

73.     On February 15, 2006, DISTEFANO's counsel submitted an appeal of his termination of LTD benefits to Prudential.

---

[8] The National Institute of Neurological and Communicative Disorders and Stroke and the Alzheimer's Disease and Related Disorders Association (NINCDS-ADRDA) classify Alzheimer's disease into definite, probable and possible levels of diagnostic certainty.  "Probable" Alzheimer's disease is the maximum level of certainty possible without pathological confirmation such as that obtained by autopsy.  See Roy Yaari, M.D. & Jody Corey-Bloom, M.D., Ph.D., *Alzheimer's Disease*, Semin. Neurol. 2007; 27(1):32-41 available at http://www.medscape.com/viewarticle/553256.

74.     On or about February 28, 2006, Prudential referred DISTEFANO's file for a review of medical records by Karyn Akey, M.D., a board certified family physician, not a neurologist.  On March 16, 2006, Dr. Akey submitted a report finding that existence of a significant impairment was not supported by the medical data.

75.     Dr. Jutkowitz confirmed in a December 1, 2006 medical questionnaire Alzheimer's disease is a progressive disease that develops slowly and causes changes in the brain long before there are obvious changes in a person's memory, thinking, and use of words or behavior.  Dr. Jutkowitz also confirmed that the progression of Alzheimer's disease is totally variable from patient to patient.

76.     In her March 16, 2006 report, Dr. Akey also opined that the diagnostic evaluations of Dr. Chece (including the WAIS-III and Bender Visual Gestalt) and Dr. Jutkowitz (including the Mental Residual Functional Capacity Assessment), both of which were accepted by the Social Security Administration as valid, lacked supportive validity assessment and therefore were not reliable diagnostic tools.  Dr. Akey suggested DISTEFANO undergo another neuropsychological evaluation.

77.     DISTEFANO underwent a neuropsychological evaluation by Prudential consultant William Barr, Ph.D. on May 15, 2006. Dr. Barr stated that DISTEFANO's "[n]europsychological test results, taken at face value, indicate that *his level of intellectual functioning is in the low average to average range, which is lower than one would expect from this man's level of education and his occupation.*" Yet, Dr. Barr dismissed the test results which substantiated the cognitive difficulties DISTEFANO reported, claiming that the results "were rendered invalid as a result of variable effort and other possible motivational factors."

78.     Dr. Barr's conclusions regarding DISTEFANO's results are at odds with each of the treating and examining specialists who provided comprehensive assessments of DISTEFANO and at odds with the medical literature on the subject of Alzheimer's.[9]

79.     By correspondence to DISTEFANO's counsel dated June 7, 2006, Prudential upheld its decision to terminate his claim for LTD benefits effective September 1, 2005 stating in summary: "Based in the documentation in file and the neuropsychological testing performed on May 16, 2006, there is no evidence to indicate that Mr. DiStefano has any form of cognitive or psychological impairment.  In addition, evidence does not support a diagnosis of Alzheimer's disease.  Testing shows substantial evidence of symptom magnification."   Prudential's letter also informed DISTEFANO he could appeal the decision to the company's Appeals Review Unit.

80.     On or about January 31, 2007, DISTEFANO's counsel submitted a second appeal of the termination of his LTD benefits to Prudential.  The appeal included as attachments: updated medical records and a completed medical questionnaire dated December 1, 2006 from Dr. Jutkowitz; a completed medical questionnaire dated December 20, 2006 from Dr. Chece; a December 18, 2006 report by Dr. Chece regarding his neuropsychological evaluation of DISTEFANO; a statement on behalf of DISTEFANO written by his wife; a DVD of approximately 22 minutes and transcript of counsel's interview of DISTEFANO and his wife and daughter; and a January 28, 2007 report by George Carnevale, Ph.D. regarding his neuropsychological evaluation of DISTEFANO.

81.     On a medical questionnaire completed December 1, 2006, Dr. Jutkowitz indicated that he observed that DISTEFANO demonstrated the following symptoms of Alzheimer's disease: memory loss; difficulty performing familiar tasks; problems with language; problems with abstract thinking; misplacing things; changes in mood or behavior; loss of initiative.  Dr. Jutkowitz also

---

[9] See *Mild Cognitive Impairment: A Neuropsychological Perspective*, authored by Margaret G. O'Connor, Ph.D. (Defendant's hired medical consultant) and Aaron P. Nelson, Ph.D. 2008.

indicated that based on his examination of DISTEFANO, he would be "unable to meet competitive standards" in a number of areas including but not limited to: understanding and remembering very short and simple instructions; maintaining attention for two hour segment; making simple work-related decisions; accepting instructions and responding appropriately to criticism from supervisors; and dealing with normal work stress.  Dr. Jutkowitz also indicated that DISTEFANO would have "no useful ability to function" in a number of areas including but not limited to:  understanding and remembering detailed instructions; carrying out detailed instructions; sustaining an ordinary routine without special supervision; setting realistic goals or making plans independently of others; dealing with the stress of semiskilled and skilled work.

82.    Dr. Chece performed a second neuropsychological examination of DISTEFANO on December 4, 2006 and December 15, 2006 which included a review of DISTEFANO's records and an extensive interview with DISTEFANO and his wife, as well as the administration of the following tests: WAIS-III, Bender Gestalt; Projective Drawings; Mental Status Exam; Beck Depression Inventory, and the MMPI-2.

83.    In a report dated December 18, 2006, Dr. Chece stated his diagnosis of DISTEFANO as Dementia of the Alzheimer's Type.  He repeated his earlier conclusion, now based on several interviews, that he "is unable to manage money due to his math difficulties, and he is unable to travel independently due to his problems with memory, confusion, agitation, depression and anxiety secondary to Alzheimer's disease…. [H]e appeared to have difficulty sustaining focus during the interview, and Mr. DiStefano often asked his wife for assistance when answering family history questions.  There were times when he was lucid and he seemed able to converse fairly well, but when asked if he remembered what he was doing about a month ago, he became fairly anxious and tearful, and reported that he could not remember."

84.     DISTEFANO also underwent a neuropsychological examination by clinical neuropsychologist George Carnevale, Ph.D., formerly at the renowned Kessler Institute for Rehabilitation and now in private practice, on December 16, 2006 and January 6, 2007.  Dr. Carnevale reviewed DISTEFANO's medical records and conducted a clinical interview of him.  Dr. Carnevale also administered following tests:  Mental Status Evaluation; Wechsler Adult Intelligence Scale-III (WAIS-III); Wechsler Memory Scale-III (WMS-III); Rey Osterrieth Complex Figure Test; Trail Making Tests A & B; Controlled Word Association Test; Beck Depression Inventory III; Wisconsin Card Sorting Test; and Test of Memory Malingering (TOMM).

85.     In a January 28, 2007 report, Dr. Carnevale stated: "The patient has had several neuropsychological evaluations and the current exam is noted to be likely biased with practice effect, particularly on the Wechsler scales.  This bias will result in an over-representation of his cognitive functioning.   Despite this bias, the patient demonstrates clear and consistent neurocognitive deficits in the area of memory, auditory processing, verbal fluency, processing speed and working memory.  These deficits have been validated on previous examinations with other examiners.  At this point and time these impairments are considered chronic and will likely progress over time.   In my professional opinion, the patient is not currently capable of competitive employment."

86.     By correspondence dated March 19, 2007, Prudential informed DISTEFANO's counsel that effective January 1, 2007, METLIFE assumed responsibility for the review and handling of all MCI WorldCom Network Services, Inc. LTD claims and that DISTEFANO's claim file had been transferred to METLIFE for consideration.

87.     On or about April 19, 2007, METLIFE referred DISTEFANO's records to Joseph Jares, M.D. "for review to determine level of functionality."  In a report dated May 8, 2007, Dr. Jares stated that "[f]rom a neurological perspective, according to the records submitted, the primary

-17-

diagnosis affecting Mr. DiStefano's ability to work are headaches and neck pain.  Other diagnoses include probable Alzheimer's disease plus hypertension, diabetes and hypercholesterolemia."  Dr. Jares' report only addressed DISTEFANO's symptoms of neck pain and headaches which Dr. Jares concluded did not preclude sedentary work.  Dr. Jares deferred to "the opinion of neuropsychology" on the issue of DISTEFANO's cognitive status.

88.    On April 30, 2007, counsel to DISTEFANO provided METLIFE determination letters referenced in allegations #58 & 59, wherein they admitted that DISTEFANO is totally disabled and entitled to a waiver of life insurance premiums, to METLIFE as a supplement to her appeal.

89.    On or about April 20, 2007, METLIFE referred DISTEFANO's records to Margaret O'Connor, Ph.D. for a "review to determine level of functionality."  In a report dated April 26, 2007, Dr. O'Connor discounted all of the testing demonstrating DISTEFANO's cognitive limitations, even that completed by Dr. Barr, the neuropsychologist retained by Prudential:

> Mr. DiStefano has reported cognitive and emotional problems for the past three years.  To date, objective data have not validated his complaints. Testing by Dr. Chece (7/19/04, 12/4/06) was not comprehensive and did not include measures of symptom validity, naming or memory.  Testing by Dr. Barr (5/15/06) was not valid as it was thought that Mr. DiStefano did not exert adequate effort during the exam.  Testing by Dr. Carnevale revealed that Mr. DiStefano performed in the impaired range but my review of test data suggested that Mr. DiStefano's effort may not have been adequate to yield valid data.  Hence, the neuropsychological findings have not provided definitive evidence that Mr. DiStefano has functional limitations.

90.    Dr. O'Connor's opinions contradict her own published writings on the subject of dementia and Alzheimer's disease. [10]

91.    On May 29, 2007, METLIFE wrote to DISTEFANO's counsel stating that they had two independent Physician Consultant reviews of his file and that they had faxed the consultant

---

[10] See *Mild Cognitive Impairment: A Neuropsychological Perspective*, authored by Margaret G. O'Connor, Ph.D. (Defendant's hired medical consultant) and Aaron P. Nelson, Ph.D. 2008.

reports to Drs. Jutkowitz and Carnevale for response (but not Dr. Chece).  The letter noted that any response had to be received by June 6, 2007 in order to be considered.

92.     Counsel for DISTEFANO wrote to METLIFE on May 31, 2007 indicating that due to their busy practices, the doctors would need an additional ten business days or until June 20, 2007, to prepare responses.  METLIFE agreed to grant this extension to June 20th.

93.     In a letter dated and mailed to METLIFE on June 12, 2007, Dr. Carnevale responded to several of Dr. O'Connor's assertions in her report, concluding that his assessment of DISTEFANO confirmed his conclusion that he was functionally unable to work.

94.     In letter dated June 19, 2007 to DISTEFANO's counsel, Dr. Chece responded to Dr. O'Connor's comments regarding his testing and findings regarding DISTEFANO.  With respect to Dr. O'Connor's contention that his testing was not comprehensive, Dr. Chece noted that "[r]esearch indicates that, **examination and evaluation are essential** in determining whether the dementia is the result of a treatable illness."(Emphasis added).  He also noted that "there is not a single comprehensive test for diagnosing Alzheimer's disease.  By ruling out other conditions through a process of elimination, physicians, or other specialists, can obtain a diagnosis of probable Alzheimer's disease with approximately 90 percent accuracy.  However, the only way to confirm a diagnosis of Alzheimer's disease is through autopsy.  It is my opinion that Mr. DiStefano was subject to several fairly thorough evaluations and results supported a diagnosis of [Alzheimer's disease] with each of the evaluations completed by Dr. Carnevale, Dr. Jutkowitz, Dr. Barr and Dr. Chece."

95.     Counsel for DISTEFANO faxed Dr. Chece's report to METLIFE on June 20, 2007.

96.     Rather than wait for the deadline of June 20, 2007 to consider any submissions from DISTEFANO's providers, METLIFE prepared a letter upholding the original denial and sent it to DISTEFANO's counsel on June 20, 2007 stating that as of that date it had not received any

responses to their consultant reports.   Thus, METLIFE deprived DISTEFANO of a full and fair review of his claim.

97.   Only after intervention from DISTEFANO's counsel did METLIFE agree to consider the reports of Drs. Carnevale and Chece which had been submitted by the June 20, 2007 deadline.

98.   On or about September 13, 2007, METLIFE submitted Dr. Carnevale's June 12, 2007 report and Dr. Chece's June 19, 2007 report to Dr. O'Connor for review.   In a report dated September 26, 2007, Dr. O'Connor commented on the additional reports and a telephone conversation she had with Dr. Carnevale.  She concluded that, as per her prior report, "objective data on file did not indicate evidence of significant cognitive problems."

99.   By correspondence dated October 1, 2007, METLIFE informed DISTEFANO's counsel that it had completed its "post appeal courtesy review" of DISTEFANO's LTD claim and that its "previous determination to withdraw benefits was appropriate and remains in effect."

100.   Throughout the claims process, DISTEFANO provided voluminous information documenting the objective manifestations of his organic brain disease. These include his medical history, his treating neurologist's notations of findings on clinical exams, testing to *exclude* other causes of dementia by means of brain imaging and laboratory tests; the record of medications DISTEFANO's treating neurologist prescribed for Alzheimer's disease; the statements of DISTEFANO and the observations of his family members; and the conclusions of Drs. Carnevale and Chece who had spent extensive time interviewing and testing DISTEFANO that he could not work.

101.   Despite the information noted on allegation #100, in its October 1, 2007 denial, METLIFE stated that "the medical records do not substantiate functional impairment as to preclude

Mr. DiStefano's capacity to perform the material and substantial duties of his regular occupation as of September 1, 2005 and ongoing."

102.    METLIFE did not provide Dr. Carnevale or Dr. Chece an opportunity to review and respond to Dr. O'Connor's September 26, 2007 report prior to denying DISTEFANO's LTD benefits on October 1, 2007.  METLIFE informed VERIZON of its decision to uphold the denial of DISTEFANO's LTD benefits via an e-mail dated October 1, 2007.

103.    On March 20, 2008, Counsel submitted further documentation to counter the statements of Dr. O'Connor that were not provided to DISTEFANO until the final denial. This included a January 10, 2008 episode of The NewsHour with Jim Lehrer interviewing young patients suffering from early onset Alzheimer's disease, who no longer work and are on long term disability "often obtained after a long fight with insurance companies."

104.    On March 20, 2008, Counsel for DISTEFANO submitted Dr. Carnevale's January 22, 2008 letter to METLIFE in which he responded to Dr. O'Connor's assertions in her September 26, 2007 report revealing that her portrayal of their conversation was "very incomplete and misrepresentative."  He further stated: "Her tone was quite condescending and I found the nature of her questions quite inappropriate and designed to determine 'if I agreed with her or not' about some broad clinical issues." Dr. Carnevale responded directly to Dr. O'Connor's misrepresentations and errors regarding their conversation and his evaluation of DISTEFANO. Dr. Carnevale stated that he was in disagreement with Dr. O'Connor's paper review and noted "**the fact that my having spent extensive time in face-to-face contact with Mr. DiStefano to perform a clinical assessment is in stark contrast to Dr. O'Connor's analysis which I believe is tainted by her position as a paper reviewer/consultant.**"(Emphasis added.)

105.    On March 20, 2008, Counsel provided the February 9, 2008, letter of Dr. Chece responding to Dr. O'Connor's September 26, 2007 report.  He noted: "Unfortunately, I did not have

the opportunity to discuss Mr. DiStefano's case with any of the independent consultants representing MetLife, which may have enabled me to shed some light on Mr. DiStefano's overall presentation during the 7 to 10 hours or more that I spent with Mr. DiStefano during the two evaluations that I completed in 2004 and 2006." Dr. Chece also explained the following, inter alia, in his February 9, 2008 letter: "Based on my observations, the test findings both in 2004 (when **Mr. DiStefano was granted SSDI benefits shortly after I submitted my report indicating positive findings for organic brain problems, and R/O [Alzheimer's disease]**), and the test results from 2006, Dr. Carnevale, Dr. Jutkowitz and Dr. Barr, everything here supports a diagnosis of [Alzheimer's disease]….I have completed more than a thousand evaluations over the course of my professional career, and after spending 7-10 hours with Mr. DiStefano, having evaluated Mr. DiStefano in 2004 and 2006, Mr. DiStefano is certainly disabled, he was awarded SSDI benefits and he is unable to continue to work at the capacity of an Accounting/Finance Executive because of his disability."

106.    On March 20, 2008, Counsel provided *Mild Cognitive Impairment: A Neuropsychological Perspective*, authored by Margaret G. O'Connor, Ph.D. (Defendant's hired medical consultant) and Aaron P. Nelson, Ph.D. 2008 and Chapter 7 Age-Related Changes in Memory, authored by Margaret G. O'Connor, Ph.D. and Edith F. Kaplan, Handbook of Human Development, Demick J, Andreoletti C. New York. Plenum Press, 2002. [11]

### REQUESTS FOR ERISA DOCUMENTS

107.    By letter dated August 16, 2006 to the VERIZON Human Resources Department in Basking Ridge, New Jersey, counsel for DISTEFANO requested the following information: a copy of any plan documents; the name and address of the plan administrator for the long term disability

---

[11] These references were contained in the Curriculum Vitae of Dr. O'Connor, provided by MetLife following the final decision on appeal. Dr. O'Connor notes that studies of patients with preclinical Alzheimer's disease underestimate the mean and overestimate the variance in the memory abilities of this population, a fact completely excluded from her assessment of DISTEFANO's test results.

plan for the company, copies of the latest annual report (Form 5500 Series) in accordance with 29 C.F.R. §2520.102-1, 29 U.S.C.S. §1024; the date on which the company provided a copy of the Summary Plan Description of the actual policy to DISTEFANO and any proof the plan administrator had of that occurrence; an updated Summary Plan Description in accordance with 29 U.S.C.S. §1022; a written summary of the plan's annual financial report; the name and address of the registered agent for service of process for the company.

108.    After receiving no response to the August 16, 2006 request, counsel for DISTEFANO resent the request to the VERIZON Human Resources Department in Basking Ridge, New Jersey by letter dated December 4, 2006.

109.    Counsel for DISTEFANO also emailed a copy of the December 4, 2006 letter to VERIZON Human Resource Manager Phyllis Norman.  Ms. Norman directed counsel to Kimberly Costin, Manager, VERIZON Health Support Services.   On December 5, 2006 counsel for DISTEFANO emailed copies of the August 16, 2006 and December 4, 2006 correspondence to Ms. Costin.  In the email to Ms. Costin, counsel requested that if she was not able to address the letters that she kindly forward them to the correct department.  Counsel never received a response from Ms. Costin.  Counsel wrote to Ms. Costin on October 29, 2007 again renewing the request for documents and again never received a response.

110.    On January 29, 2008, counsel for DISTEFANO again requested the plan documents via a telephone call with Cheri Reinhardt of VERIZON Health Support Services.  Ms. Reinhardt informed counsel that she could supply the Summary Plan Description but that any other plan documents would need to be requested from the VERIZON Legal Department in Ashburn, Virginia. Ms. Reinhardt subsequently faxed counsel portions of the 2004 MCI Health and Welfare Plan Summary Plan Description.

111.   By letter dated January 31, 2008 to the VERIZON Legal Department, counsel for DISTEFANO repeated her request for information pertaining to his claim and also requested information from DISTEFANO's personnel file.

112.   In a letter dated February 15, 2008, Jody Groff of the VERIZON Legal Compliance office in San Angelo, Texas, informed counsel for DISTEFANO that records could only be released with a subpoena or court order.  Ms. Groff's letter ignored counsel's request for plan documents.

113.   On February 19, 2008, counsel for DISTEFANO telephoned Ms. Groff to clarify that in addition to personnel records, she sought information which VERIZON was required to supply under ERISA and that a subpoena was not required to obtain this information.  Ms. Groff disputed this and maintained that VERIZON would not provide any documents without a subpoena or court order.  Therefore, counsel for DISTEFANO documented her request once again by letter dated February 19, 2008 to Ms. Groff and, as with previous letters, cited to pertinent provisions of ERISA outlining VERIZON's affirmative, legal and fiduciary duty to provide the information requested.

114.   VERIZON finally complied with DISTEFANO counsel's eighteen month long request for information to which he is entitled under ERISA by correspondence from Molly Iacovoni of Hewitt Associates LLC enclosing the materials dated February 29, 2008.  Counsel for DISTEFANO received the requested materials on March 3, 2008, 565 days after she initially requested the information on his behalf from VERIZON.

115.   In her correspondence dated February 29, 2008, Ms. Iacovoni asserted that DISTEFANO was provided a copy of the 2004 SPD and as proof attached: (1) an email addressed to all MCI US Employees dated October 24, 2003 stating that the 2004 SPD would be posted online and (2) a newsletter which was an attachment to the email and provides a link for "2004 Benefits

Highlights."   This electronic provision of the 2004 SPD is not in accordance with the requirements of 29 CFR § 2520.104b-1.

## FIRST CAUSE OF ACTION

116.    DISTEFANO incorporates those allegations of the General Allegations, Jurisdiction, Parties and Background sections as though set forth in full in this cause of action.

117.    An actual controversy exists between DISTEFANO and Defendants arising out of the events alleged herein above. Specifically, Defendants have no legal basis for denying DISTEFANO benefits.

118.    Under the terms of the PLAN, Defendants agreed to provide DISTEFANO with certain disability insurance benefits in accordance with the terms and conditions set forth.

119.    To date, Defendants have failed and refused to pay DISTEFANO the benefits to which he is rightfully entitled from September 1, 2005 to the present.

120.    DISTEFANO has satisfied all conditions precedent under the PLAN and is thus eligible to receive benefits for he has not waived or otherwise relinquished his entitlement to benefits.

121.    Denial of benefits to DISTEFANO was contrary to and in breach of the terms of the PLAN.

122.    DISTEFANO seeks reimbursement and compensation for any and all benefits he would have received from the inception of coverage, continuing into the future as long as he continues to fulfill the requirements under the PLAN.

123.    As a direct and proximate result of the aforementioned conduct of the Defendants in failing to pay DISTEFANO benefits, he has been damaged in an amount equal to the amount of benefits to which he is entitled under the terms of the PLAN plus interest, for a total amount to be determined at the time of trial.

124.    Defendants unreasonably and wrongfully denied DISTEFANO benefits based on unfair claims handling including but not limited to an incomplete and biased review of DISTEFANO's records and information to support their conclusions that he was not in fact totally disabled and reliance on biased, insufficient, and inaccurate reports of hired medical reviewers.

125.    The denial of the benefits is a breach of the PLAN, in utter disregard of the Record and Claim File and unsupported by substantial evidence.

126.    The unlawful behavior of Defendants is evidenced by the following:

a.   Failing to authorize benefit payments to DISTEFANO at a time when they knew that he was entitled to said benefits under the terms of the PLAN, in bad faith and contrary to the PLAN;

b.   Unreasonably withholding payments from DISTEFANO knowing his claims for benefits were valid;

c.   Unreasonably failing to pay DISTEFANO benefits without having any evidence, substantial or otherwise, supporting their decision to deny benefits;

d.   Completely disregarding DISTEFANO's treating physicians' assessment of his medical condition and how it restricts and limits him from performing his occupation or any occupation without any basis for doing so.

e.   Selectively highlighting certain factors and medical reports and conversations with DISTEFANO's treating physicians in order to cast a favorable light on its position while ignoring the conclusions of DISTEFANO's treating physicians regarding the conditions for which they rendered treatment;

f.   Improperly adding extra-contractual requirements to qualifying for benefits that are not in the PLAN, namely that DISTEFANO prove his disability by objective evidence;

g.   Completely disregarding DISTEFANO's own assessment of his medical condition and how it restricts and limits him from performing his occupation or any occupation;

h.   Completely disregarding the statement of third parties regarding DISTEFANO's medical condition and how it restricts and limits his activities of daily living;

i.   Engaging in a pattern of procedural irregularities to advance their own personal interests in denying benefits, to the detriment of PLAN participants;

-26-

j.   Improperly refusing to provide information relevant to the denial determination, which they were obligated to provide pursuant to 29 CRR § 2560.503-1(b), in violation of ERISA;

k.   Consistently acting in their own personal interests instead of those of the PLAN and its participants;

l.   Failing to conduct an appropriate vocational assessment of DISTEFANO prior to denying him benefits;

m.   Completely disregarding the Social Security Administration's determination that DISTEFANO is totally disabled and eligible for benefits;

n.   Improperly denying DISTEFANO benefits without any information that his condition had improved from the time that Prudential initially approved his claim.

127.   Contrary to clear, compelling and substantial medical and functional evidence, Defendants wrongfully denied DISTEFANO's total disability claim and have wrongfully maintained that denial to this date.

128.   As a direct and proximate result of the conduct alleged herein, DISTEFANO has been damaged in an amount equal to the amount of benefits he would have received had Defendants paid his benefits.

129.   DISTEFANO has been forced to bring the instant action as a direct result of Defendants' unlawful denial and violations of the PLAN and ERISA.

130.   As a direct result of Defendants' acts, actions and activities, DISTEFANO has incurred costs and attorney's fees in the prosecution of this action.

131.   DISTEFANO is entitled to recover his attorney's fees and costs incurred in prosecution of the instant action, including prejudgment interest, pursuant to 29 U.S.C. § 1132(g), ERISA § 502(g).

## SECOND CAUSE OF ACTION

132.   DISTEFANO incorporates those allegations of the General Allegations, Jurisdiction and Background sections along with the Second Cause of Action as though set forth in full in this cause of action.

133.   The MCI COMMITTEE n/k/a the VERIZON COMMITTEE is a fiduciary within the meaning of 29 U.S.C. § 1001, et seq., specifically 29 U.S.C. § 1002 (21) (a) and are subject to the duties and liabilities set forth in 29 U.S.C. § 1104, § 1105 and § 1109.

134.   The MCI COMMITTEE n/k/a the VERIZON COMMITTEE represented to DISTEFANO that benefits would be paid if he met the terms and conditions of the PLAN, but failed to fulfill its obligation to discharge their duties solely in the interest of PLAN participants.

135.   The MCI COMMITTEE n/k/a the VERIZON COMMITTEE breached its fiduciary duties by utilizing claims administrators who failed to properly administer the claims and provide the claimant with a full a fair review including but not limited to:

a.   Engaging in a pattern of procedural irregularities to advance their own interests in denying benefits, to the detriment of PLAN participants;

b.   Consistently acting in their own interests instead of those of the PLAN and its participants;

c.   Completely disregarding the Social Security Administration's determination that DISTEFANO is totally disabled and eligible for benefits;

d.   Improperly denying DISTEFANO benefits without any information that his condition had improved from the time that Prudential initially approved his claim.

136.   As a result of using claims administrators who failed to properly administer each and every claim and failing to provide oversight of the claims administrators' actions, the MCI COMMITTEE n/k/a the VERIZON COMMITTEE failed to establish an adequate plan and procedure by which disability claims were processed and evaluated.

137.   The MCI COMMITTEE n/k/a the VERIZON COMMITTEE breached its fiduciary duties by failing to establish a procedure by which a claimant could readily access complete and

correct PLAN information in accordance with 29 U.S.C. §§ 1024(b)(4) & 1029 and of 29 C.F.R. §2520.

138.    As a direct result of the acts, actions and activities of the MCI COMMITTEE n/k/a the VERIZON COMMITTEE through their retained administrators, DISTEFANO has incurred costs and attorney's fees in the prosecution of this action.

139.    DISTEFANO is entitled to recover his attorney's fees and costs incurred in prosecution of the instant action, including prejudgment interest, pursuant to 29 U.S.C. §1132(g), ERISA §502(g).

## THIRD CAUSE OF ACTION

140.    DISTEFANO incorporates those allegations of the General Allegations, Jurisdiction and Background sections along with the previous Causes of Action as though set forth in full in this cause of action.

141.    The Plan Administrator, improperly refused to provide DISTEFANO information to which he was entitled pursuant to 29 U.S.C. §§ 1024(b)(4) & 1029, within 30 days of request made by letter dated, August 16, 2006, and by subsequent letters and emails dated December 4, 2006, December 5, 2006, October 29, 2007, December 17, 2007, January 29, 2008, January 31, 2008, and February 19, 2008 in violation of ERISA.[12]

142.    The Plan Administrator did not produce the required documents until March 3, 2008, 565 days after it was required to produce them, pursuant to ERISA, 29 U.S.C. §§ 1024(b)(4).

143.    This violation of 29 C.F.R. §2560.503(g)  subjects the Plan Administrator, identified by the Plan Documents to include VERIZON to statutory penalties in the amount of $110.00 per day for each day VERIZON failed and refused to provide  DISTEFANO with copies of the relevant documents requested by counsel.

---

[12] See letters and email correspondence dated August 16, 2006, December 4, 2006, December 5, 2006, October 29, 2007, December 17, 2007, January 29, 2008, January 31, 2008 and February 19, 2008 attached as Exhibit F.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

## FIRST CAUSE OF ACTION

1.     An Order directing Defendants to reinstate DISTEFANO under the PLAN.

2.     An Order directing Defendants to award to DISTEFANO total disability benefits due and owing from September 1, 2005 to the present, including with an award of pre-judgment interest.

3.     An Order declaring that DISTEFANO is to receive disability benefits in the future for so long as he continues to qualify under the PLAN.

4.     Payment of reasonable attorney's fees pursuant to 29 U.S.C. §1132(g), costs incurred in this action; and for such other and further relief as the Court deems appropriate.

## SECOND CAUSE OF ACTION

5.     An Order directing the removal of METLIFE and/or its subsidiaries from performing fiduciary or administrative duties with regard to the PLAN and replacing METLIFE with an independent and impartial administrator who does not have any connection to METLIFE.

6.     An Order requiring the VERIZON COMMITTEE to establish procedures by which a claimant can readily access plan information in accordance with ERISA and applicable regulations.

7.     An injunction barring the VERIZON COMMITTEE from engaging in any further breaches of fiduciary duties and/or acts or practices.

8.     Declaration of the VERIZON COMMITTEE's noncompliance with the terms of the PLAN.

9.     Declaration of the VERIZON COMMITTEE's noncompliance with the minimum requirements of ERISA.

10.     Declaration of the VERIZON COMMITTEE's breach of their fiduciary duties under ERISA.

## THIRD CAUSE OF ACTION

11.     An Order for the payment of a penalty from the Plan Administrator on behalf of the PLAN representing $110.00 per day from August 16, 2006 to the present, for its failure and the failure of its fiduciary and administrator to provide to Plaintiff copies of PLAN documents and other relevant documents requested by counsel in violation of ERISA, 29 C.F.R. § 2560.503-1(g), 29 U.S.C. § 1024, and § 1029, subjecting them to penalties under 29 U.S.C. § 1132(c).

12.     Payment of reasonable attorneys' fees, costs incurred in this action, and for such other and further relief as the Court deems appropriate.


Dated:  March 28, 2008                 BY:   */s/ Bonny Rafel*
                                                                    _____
                                             BONNY G. RAFEL, ESQ.  (6929)
                                             570 West Mount Pleasant Ave., Suite 106
                                             Livingston, New Jersey   07039
                                             (973) 716-0888
                                             Attorney for Plaintiff,
                                             Pino DiStefano